**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

RONALD WELLS,                              )
                                           )
           Plaintiff,                  )
                                           )
       v.                            )
                                           )
WACHOVIA MORTGAGE CORPORATION;             )
REPUBLIC MORTGAGE, INCORPORATED;           )
UNIQUE INVESTMENT; TONY CASH;              )
ROMERE SOUTHALL; and DOES 1-10,            )
                                           )
           Defendants.                 )

```
FILED: AUG 12, 2008
08CV4571
JUDGE GOTTSCHALL
MAGISTRATE JUDGE VALDEZ
RCC
```

**JURY DEMANDED**

## COMPLAINT

### INTRODUCTION

1.    Plaintiff Ronald Wells brings this action against a sub-prime mortgage lender, a mortgage broker, a real estate agent or investor, the prior owner of said real estate and others to secure redress for fraud, negligence, discrimination and other predatory practices.

### JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction under 28 U.S.C. §§1331 (general federal question), 1337 (interstate commerce), 15 U.S.C. § 1679b (Credit Repair Organizations Act), 12 U.S.C. Sect. 2601, et seq. (Real Estate Settlement Procedures Act), 42 U.S.C. Sect. 1981 (Civil Rights Act), 42 U.S.C. Sect. 3605 (Fair Housing Act) and 15 U.S.C. Sect. 1691 (Equal Credit Opportunity Act), and 1367 (supplementary jurisdiction).

3.    Defendants all transact business in the District and are deemed to reside here.

### PARTIES

4.      Plaintiff Ronald Wells is a first-time home owner who resides in a single-story, raised ranch house located at 9216 S. Avalon, Chicago, Illinois, 60619.

5.      Plaintiff is African-American.

6.      Defendant Wachovia Mortgage Corporation ("Wachovia") is a residential mortgage lender with corporate headquarters located at 1525 W.W.T. Harris Boulevard, Charlotte, North Carolina, 28288.  Wachovia does business in Illinois.  Its registered agent office and address are:  Prentice Hall Corporation, 33 North LaSalle Street, Chicago, Illinois, 60602.

7.      Wachovia is the residential lending subsidiary of Wachovia Corporation. Wachovia Corporation is a publically-traded, diversified financial services corporation, which includes, as one of its subsidiaries, the fourth largest bank in the U.S.  Wachovia Corporation's headquarters are located at 301 South College Street, Suite 4000, One Wachovia Center, Charlotte, North Carolina, 28288-0013.  Wachovia Corporation and its subsidiaries transact business and maintain branches throughout the United States, including several branches in the Northern District of Illinois.

8.      Wachovia Mortgage Corporation originates residential mortgage loans through both retail channels at Wachovia financial centers located in the southeastern United States and through wholesale channels, such as its authorized mortgage brokers and bankers located throughout the U.S.

9.      Defendant Republic Mortgage, Incorporated ("Republic") is an Illinois-licensed mortgage broker with principal offices at 2127 West Belmont Avenue, Chicago, Illinois, 60618.  It does business in Illinois.  Republic's registered agent is Michael W. Looby, 1717 South Cumberland Avenue, Park Ridge, Illinois, 60068.

10.    On information and belief, Tony Kash is the President and founder of Unique Investment, a real estate investment, re-sale and/or brokerage company.  Kash and Unique Investment do business in Illinois but are unincorporated.  On information and belief, Unique Investment may be found at 151 North Michigan Avenue, Chicago, 60601-7506.

11.    Romere Southall is identified, on the HUD-1 Settlement Statement (Exhibit D) for the transaction, as the seller of the property plaintiff purchased.  On information and belief, he had or has a business relationship with defendant Tony Kash and/or Unique Investment.

12.    DOES 1-10 are any other persons who engaged in or aided and abetted the predatory practices, disclosure violations and other wrongdoing alleged below and whose identities and whereabouts are as yet unknown to plaintiff.

## FACTS RELATING TO ALL COUNTS

13.    Plaintiff is a simple, unsophisticated consumer.  At the time of the transaction described below, he worked at a retail seafood business and drove a taxicab for a living.  Plaintiff had never purchased or owned property prior to the transaction with defendants.

14.    In May, 2007, plaintiff met Tony Kash when the latter needed a driver to drive him to and from court-mandated, safe driving classes.

15.    Kash befriended plaintiff.

16.    When plaintiff happened to mention he was looking for a new apartment, Kash asked if he had considered buying a home.  Plaintiff had not because he had no credit, except for the financing on his cab and credit cards.  Kash persisted.  He encouraged plaintiff to buy and told him he would look into it for him.

17.    Plaintiff asked Kash, "I have a minimum wage job.  Do you think it will be enough?"  Kash said it would not be a problem.

18.    Kash identified himself to plaintiff as a "real estate investor" and told plaintiff he had a couple of houses he wanted plaintiff to look at.

19.    At all times, Kash knew that plaintiff had limited income, had never purchased a home, and had little knowledge of real estate or mortgage financing.

20.    Nevertheless, Kash showed plaintiff homes that he knew plaintiff could not afford.

21.    These were houses that, on information and belief, were owned at that time by Unique Investment, which Kash controlled.

22.    The second home Kash showed plaintiff was located at 9216 S. Avalon, Chicago, Illinois, 60619.  When plaintiff first saw the home, it was being renovated.

23.    Plaintiff liked the home and selected it as the one for purchase.

24.    Kash did not advise or instruct plaintiff on how to make an offer or on how to negotiate the purchase price or other terms of a real estate purchase contract.

25.    In fact, plaintiff never made an offer.  Kash simply told plaintiff that the price was $195,000.  It was not clear to plaintiff who the seller was.

26.    On information and belief, Southall, Kash and/or Unique Investment were the sellers.

27.    Kash then arranged most aspects of the purchase and financing transactions for plaintiff and on his behalf, including but not limited to:  the real estate purchase agreement, the appraisal, the home inspection, the financing, plaintiff's home owner's insurance policy and the closing.

4

28.     Plaintiff dealt primarily with Kash concerning the terms of financing for the purchase of the home.

29.     On more than one occasion, Kash had plaintiff sign certain documents for a loan in plaintiff's cab, including, on information and belief, a loan application.

30.     However, plaintiff never received any written, preliminary disclosures of loan terms, such as a Good Faith Estimate of Settlement Charges or a preliminary Truth-In-Lending Disclosure Statement, from any defendant, in violation of the Real Estate Settlement and Procedures Act.

31.     Prior to viewing any houses, plaintiff told Kash that he could afford to pay a total of $1,000 per month (including principal, interest and amounts for escrow of taxes and insurance).  Plaintiff also told Kash that $1,200-1,300 would be a struggle for him.

32.     After showing the property but prior to closing, plaintiff asked Kash if he should have an appraisal performed.  Kash advised plaintiff that he did not need an appraisal because one had already been done and had come out at $200,000.

33.      Prior to closing, plaintiff also asked Kash if he (plaintiff) needed a lawyer for the transaction.  Kash told plaintiff he did not need a lawyer.

34.     Kash instructed plaintiff where and when closing would take place, and plaintiff showed up at the appointed time and place.

35.     Just before closing on June 11, 2007, Kash told plaintiff that he was not able to get him a loan with a payment lower than $1,300 per month total, but that he (Kash) could get it down to $1,000 per month if plaintiff refinanced with him 7-8 months later.

36. Plaintiff never received any written notification of a change in loan terms or in the payment amount Kash quoted him, as required by the Illinois Residential Mortgage License Act. Kash's oral notification was not accurate.

37. In addition, Kash had also told plaintiff prior to closing that there would be no out-of-pocket expenses, although the HUD-1 Settlement Statement (<u>Exhibit D</u>) indicates plaintiff was required to bring $500 to closing.

38. Because plaintiff had never been through the home purchase and financing process before, most of these representations, omissions or changes did not seem unusual or questionable.

39. Closing occurred at a title company on or about June 11, 2007. Kash was present, as was Southall, the putative seller. On information and belief, Kash and Southhall were business associates in the transaction; both benefitted financially from the sale of the property, as alleged below.

40. The signing was rushed. Plaintiff did not receive any explanation about the contents of the documents or the terms of financing. He was simply shown where to sign and initial. He followed instructions.

41. The following are true and accurate reproductions of documents relating to the loan that Republic arranged and Wachovia originated to plaintiff:

a. A note in the amount of $195,000.00 at an interest rate of 7.5% (<u>Exhibit A</u>);

b. A mortgage (<u>Exhibit B</u>);

c. A Truth-In-Lending Disclosure Statement with the required disclosures cut off from view (<u>Exhibit C</u>);

6

d.    A HUD-1 Settlement Statement with the "Escrow Receipt and Disbursement Authorization" attached (<u>Exhibit D</u>); and

e.    A final loan application (<u>Exhibit E</u>).

42.    Plaintiff received a loan with a monthly payment principal and interest payment of $1,363.47.  However, with taxes and insurance, plaintiff's monthly payment comes to $1,686.84.  Defendants never properly disclosed or advised plaintiff of this fact.

43.    Defendants arranged for financing for 100% of the appraised, market value of the home.

44.    In addition, line 506 of the HUD-1 Settlement Statement indicates that a $20,000 "investor/rehab payment" of proceeds was made to Tony Thomas.

45.    However, Page 1 of the "Escrow Receipt and Disbursement Authorization" contradicts this representation.  It shows that Unique Investment received a $10,000 "rehab fee," while Tony Thomas received an "investor/rehab payment" of just $10,000.

46.    Further, line 603 of the HUD-1 and Page 2 of the Escrow Receipt and Disbursement Authorization shows that Southall received $70,014.41 in net proceeds from the transaction (<u>Exhibit D</u>).

47.    The HUD-1 Settlement Statement (<u>Exhibit D</u>) also indicates that Southall paid all closing costs.  Plaintiff had not asked for that and did not know to ask for it.

48.    Finally, plaintiff was never informed by any defendant that, due to Wachovia's payment of $6,078.15 in "broker comp" or yield spread premium ("YSP") to Republic in connection with the loan (<u>Exhibit D</u>, page 2, line 811), Wachovia assigned plaintiff a higher interest rate than he qualified for, as alleged more fully below.  No defendant ever

explained to plaintiff the meaning of the YSP.  No defendant made plaintiff aware of the choice between interest rates or informed him that the rate for the loan was negotiable.

49.    The effect of the YSP was material information for plaintiff.  Because plaintiff had reasonably good credit, he could have obtained the mortgage loan at a significantly lower interest rate if Wachovia and Republic had not agreed in advance of closing to unnecessarily and artificially raise his interest rate and divide the spoils between them, as further explained below.

50.    Several months later, when plaintiff called Kash to follow up on the latter's promise to refinance his house in order to lower his monthly payment, Kash put him off, and, shortly after that, Kash's phone number was changed.

## FACTS RELATING TO FRAUD IN THE INDUCEMENT

### Loan Application

51.    In May, 2007, defendants asked plaintiff for, and plaintiff provided, truthful and accurate information and documentation concerning his income, employment and education.

52.    Among other things, plaintiff provided to Kash his most recent paystubs from his work at Lawrence Fisheries.  Upon Kash's request, he also provided letters from recent creditors to show that he had paid off his debts.

53.    However, defendants caused plaintiff's final, 1003 loan application (Exhibit E) to be completed utilizing false financial and other information about plaintiff.  In fact, defendants fabricated an entire financial and employment profile for plaintiff.

54.    Completed by Michael Looby, an agent of Republic, the computer-generated, pre-printed application (Exhibit E) makes plaintiff out to be a highly educated, highly

8

skilled, highly paid individual.  It discloses that he has 18 years of school (i.e., undergraduate

and graduate degrees)(Section III); that he has been employed by "Supreme Electronics" as a

"Foreman" for 23 years (Section IV.); that he earns $8,243.00 per month in gross income from

employment (Section V.), the equivalent of a $99,000 annual salary; that he had a $35,724 cash

balance in an account with LaSalle Bank; and that he had personal property worth $35,500.

55.     All of these representations are false.

56.     In fact, plaintiff did not finish ninth grade and later earned his G.E.D.

57.     Plaintiff has never heard of Supreme Electronics, never worked as a

foreman (nor had the training to do so), had only been in his then-present jobs for about 18

months each, and earned about $3,500 per month in gross income from both jobs combined.

58.     In fact, plaintiff's only bank accounts (checking and savings) were with

Chase Bank, and his balances at the time did not exceed approximately $900.00.

59.     In fact, plaintiff's only valuable piece of personal property was his cab,

which at the time was worth about $13,000.

60.     Moreover, plaintiff had rented for five years, not eight, at the time the

application was filled out, and his monthly rental payment was substantially less than $1,880

(Section III).

61.     Finally, the application states that it was taken *via* internet (Section IX).

However, plaintiff never filled out an application over the internet.  He does not use computers.

62.     If the application was taken over the internet, it was filled out by Kash,

who went to www.uptherepublic.com, pretended he was plaintiff and input the false information.

**Appraisal**

63.     Prior to June 11, 2007, Kash, Looby and/or Republic ordered and arranged for an appraisal of the property at 8216 S. Avalon in Chicago.

64.     The appraiser was a company named "Accurate," according to the HUD-1 (Exhibit D, line 803).  Plaintiff never received a copy of the appraisal report and does not have any additional information about Accurate at the present time.

65.     Accurate was Kash, Looby and/or Republic Mortgage's agent for purposes of performing the appraisal.

66.     On information and belief, defendant(s) conspired with Accurate prior to June 11, 2007 to arrange for a fraudulently inflated appraisal of the market value of the property at 9216 South Avalon.

67.     On information and belief, defendants contacted Accurate prior to that date and advised it of the value they needed (i.e., at least $195,000, which was the contract purchase price) in order to support the loan amounts they wanted to make to plaintiff.  They agreed upon a value in advance of any actual appraisal.

68.     Accurate obliged in order to continue to receive a stream of business from defendants.  On information and belief, a significant share of the volume of Accurate's business in 2007 came through one or more defendants.

69.     Prior to June 11, 2007, Accurate appraised the home and property and prepared an appraisal report stating that the market value was $195,000 or $200,000.  This amount was significantly and artificially inflated relative to comparable homes in the surrounding area.

70.     On information and belief, defendants conspired and arranged to insert false information on plaintiff's loan application and to inflate the home's appraised value in

order to make it appear (for the sake of getting the loan approved by underwriting) that plaintiff could afford to purchase the house and repay the loan.

71.     Indeed, plaintiff's application falsely represents that the amount of the monthly mortgage payment under the loan is about $100 less than plaintiff's then-current monthly rental payment (Section V.).

72.     The income stated on the loan application and the reported, appraised value support the amount of financing defendants needed to lend plaintiff in order to finance the contract price.  Defendants inserted the false information onto the final loan application and arranged for plaintiff to sign it hurriedly at closing, among scores of other documents amounting to hundreds of pages.

73.     Wachovia was aware or became aware of the fraud on the loan application.

74.     On information and belief, prior to June 11, 2007, Kash, Looby and/or Republic transmitted the fraudulent information about plaintiff's income, employment and property value to Wachovia.

75.     Prior to approving the loan, Wachovia performed its own, independent verification of plaintiff's income, employment and the property value, as well as its own underwriting analysis, and approved the loans.  Wachovia knew or should have known and discovered that the income, employment and home appraisal submitted for plaintiff was fraudulent and inflated.

76.     Alternatively, Wachovia was negligent in failing to discover that the information was fraudulent.

77.    Wachovia had a non-delegable duty to verify plaintiff's income and employment information.  In fact, on information and belief, Wachovia performed a verification of employment and an independent inquiry of the value of the property.

78.    On information and belief, Wachovia also had other information from Kash, Looby, Republic and/or plaintiff from which it knew or should have known of or discovered fraud.

79.    In addition, following closing Wachovia performed another analysis, an internal audit, on plaintiff's loan file to check to ensure that the income, employment and/or appraised value were accurate and/or had been verified by Wachovia staff.  Once again, Wachovia passed the loan when any reasonable inquiry would or should have revealed fraud by Wachovia and/or other defendants.

80.    In fact, plaintiff could not afford the payment on the loan.  By basing the loans on an inflated home value, falsely inflated income figures, supported by false employment and educational information, defendants fraudulently or negligently represented to plaintiff that he could afford the home.  Defendants knew or should have known that he could not afford to make the payments based on this information.

81.    But all defendants faced an enticing commission structure.  They falsely inflated plaintiff's income and appraised value to induce him to take out the purchase money loan, which in turn increased the amount of defendants' percentage-based, closings fees, defendants' return on the property, as well as Wachovia's future interest income and profits from the loan.  Wachovia also paid a handsome yield spread premium payments to Republic in connection with the loan.  Most of these profits were realized immediately upon disbursement of the loan.

82.    In addition, on information and belief, Kash received an illegal kickback payment in exchange for steering plaintiff's financing business to Looby, Republic and Wachovia.

83.    On information and belief, Kash and other defendants have a pattern and practice of committing the same types of fraud and fraudulent or negligent misrepresentation against consumers in other mortgage transactions.

84.    As noted, plaintiff attempted to refinance out of defendants' loan.

85.    For much of the last year, plaintiff had been driving his cab seven days a week, 12 hours a day, including double shifts on Saturdays and Sundays, in an effort to maintain the payments on the house.

86.    When he realized he could not make enough money to afford the payments, plaintiff became depressed for several months.

87.    Before consulting with present counsel, plaintiff had given up hope and had started packing his belongings.

88.    In July, 2008, Wachovia initiated a foreclosure action against plaintiff in the Circuit Court of Cook County, 08 CH 25180.  Plaintiff is now faced with the prospect of losing his home.

## FACTS RELATING TO AGENCY

89.    For the reasons set forth below, at all times Republic was an agent of Wachovia.  Looby was an agent of Republic and, therefore, a subagent of Wachovia.  Kash was an agent of Republic and an agent or subagent of Wachovia.  Kash was also an agent of Unique Investment.

90.    Kash represented to plaintiff that he had authority from Wachovia and Republic to arrange or grant mortgage financing to him and to grant or at least influence the specific terms of that financing.

91.    Kash conducted most or all of the meetings and discussions with plaintiff and made most of the material representations to him concerning the financing and the loan's proposed terms.

92.    On information and belief, following closing Kash received compensation from Republic, Looby and/or Wachovia in exchange for his role in steering plaintiff's mortgage financing business to them.

93.    Plaintiff gave the supporting information and documents (described above) for his loan application to Kash and/or Looby.  These documents were later given to Republic and Wachovia.

94.    In connection with plaintiff's loan, Wachovia paid Republic a total of $6,078.15 for the latter's role in arranging the loan to plaintiff (Exhibit D, page 2, line 811). Wachovia paid the "yield spread premium" ("YSP") primarily in exchange for Republic's agreement to increase plaintiff's interest rate above the "par" rate that he qualified for.

95.    To this end, Wachovia provided Republic with information about Wachovia's broker-compensation policies and formulae.  These policies gave Republic and Looby the incentive to arrange plaintiff's loan and to increase plaintiff's interest rate.

96.    In this manner, Wachovia authorized Republic and gave it discretion to increase the interest rate on plaintiff's loan.

97.    Because of Republic's interest rate mark-up, Wachovia received additional income and profit from plaintiff's loan.

98.    On information and belief, Republic directed some or all of the YSP payment to Looby and/or Kash as compensation.

99.    In addition, on information and belief, Wachovia and Republic had a written agreement to do business with each other.  Wachovia contracted with Republic in order to find prospective borrowers.

100.    Pursuant to that agreement, Wachovia authorized Republic to broker or arrange mortgage loans on Wachovia's behalf.

101.    Pursuant to the agreement, a significant number of loans brokered by Republic were placed with or originated by Wachovia.

102.    Pursuant to the agreement, Wachovia authorized Republic to accept applications on its behalf, to quote financing rates and terms, to inform credit applicants of their financing options and to originate finance transactions, all, on information and belief, by using Wachovia's website, computer software and its forms.

103.    Pursuant to the agreement, plaintiff's loan was actually arranged by Republic in reliance on Wachovia's credit-granting policies.

104.    In particular, as one example, Republic consulted and followed Wachovia's "rate sheets" and/or "product sheets" in setting the terms of plaintiff's loan.  This information was available to Republic (and other Wachovia-authorized mortgage brokers) on Wachovia's website, and, on information and belief, Republic utilized Wachovia's software to price plaintiff's loan.

105.    On information and belief, Wachovia also made its form closing documents available to Republic on Wachovia's website, as well as Wachovia's training and

instructions on its website for filling out such documents, and Republic utilized those documents and instructions to arrange plaintiff's loan.

106.    On information and belief, Republic prepared the documents necessary for plaintiff's loan from Wachovia.

107.    On information and belief, Republic and/or Kash arranged for the closing of plaintiff's loan from Wachovia.

## COUNT I – CREDIT REPAIR ORGANIZATIONS ACT

108.    Plaintiff incorporates paragraphs 1-107.    This claim is against all defendants.

109.    Defendants violated the Credit Repair Organizations Act ("CROA"), 15 U.S.C. Sect. 1679b, by fraudulently inflating and falsifying plaintiff's income, employment and other pertinent information on his loan applications and by fraudulently overstating the value of the property plaintiff sought to purchase.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:  actual, punitive and other appropriate damages; equitable relief; attorney's fees, litigation costs; and such other or further relief as the Court deems appropriate.

## COUNT II – RESPA

110.    Plaintiff incorporates paragraphs 1-107.  He brings this count against all defendants.

111.    Plaintiff's loan from Wachovia was a federally-related mortgage loan, within the meaning of the Real Estate Settlement Procedures Act ("RESPA").

112.     On information and belief, Wachovia paid Republic the YSP in exchange for increasing plaintiff's interest rate and/or for steering or referring mortgage business to Wachovia, not for other goods and services actually rendered.  The YSP was an illegal kickback or unearned fee.

113.     Alternatively, the YSP payment did not bear a reasonable relationship to the market value of any goods or services actually provided by Republic.

114.     On information and belief, Wachovia and Republic illegally split with each other the additional compensation earned from the transaction as a result of the imposition of the YSP.

115.     In addition, on information and belief, Kash and Looby received payments and kickbacks in exchange for steering mortgage business to Republic, Wachovia and third parties whose identities plaintiff does not presently know.

116.     On information and belief, Wachovia, Republic and/or Looby compensated Kash and/or Unique Investment for steering mortgage financing business to them by splitting the fees they earned from the transaction with them.

117.     These referral arrangements and transactions were not disclosed to plaintiff, and plaintiff was not provided with any written estimate of the charge or charges of the defendant(s) to which/whom he was referred.

118.     On information and belief, defendants' secret agreements to engage in this conduct were oral and/or written.

119.     Defendants' conduct violated 12 U.S.C. Sect. 2607(a) and/or (b) and 24 C.F.R. 3500.14(b) ("Regulation X").

120.    Plaintiff is entitled to the statutory and treble damages provided for by 12 U.S.C. Sect. 2607(d).

**<u>Tolling of Statute of Limitations</u>**

121.    RESPA's one-year statute of limitations was tolled by defendants' fraudulent concealment of these secret transactions.

122.    Defendants took active, affirmative steps to conceal these payments and fee splits from plaintiff and from the rest of the world.

123.    Defendants carefully omitted these transactions from all of the loan documents provided to plaintiff at closing or at anytime.

124.    Defendants' agreements to engage in these transactions were exclusively oral or, if written, were known only to themselves.

125.    Further, plaintiff, despite his due diligence, did not and could not have discovered these secret transactions earlier.

126.    The transactions are not apparent from any of the closing documents plaintiff received, defendants' agreements with each other were either exclusively oral or, if written, plaintiff did not have access to any written agreements between defendants.

127.    Because of the secret nature of these transactions, plaintiff was prevented from becoming aware of these transactions at the time they occurred.

WHEREFORE, plaintiff requests that the Court enter judgment in his favor and against defendants for:

a.      Statutory damages;

b.      Attorney's fees, litigation expenses and costs of suit; and

c.      Such other or further relief as the Court deems proper.

18

## COUNT III – COMMON LAW FRAUD

127.    Plaintiff incorporate paragraphs 1-107.  This claim is against all defendants.

128.    Defendants arranged for and/or approved the false statements on plaintiff's final loan application and the fraudulent appraisal of the property plaintiff sought to purchase.  They approved and originated a loan to plaintiff, the principal amount of which was based on the artificially inflated value and the false statements they inserted into the loan application.

129.    Defendants knew that the information on the loan application and the appraised value were inflated and false or were reckless with respect to their truth or falsity.

130.    Defendants intended for plaintiff to rely on the false statements in the loan application and the fraudulent appraised value in order to induce him to take out the loan.

131.    The value of the property and plaintiff's ability to afford the loan were material terms and predicates of the transaction with defendants.

132.    Plaintiffs did, in fact, rely on defendants' fraudulent statements and misrepresentations.  Plaintiff's reliance was justified.

133.    Plaintiff was injured thereby.

WHEREFORE, plaintiff request that the Court enter judgment in his favor and against defendants for:

a.      Actual, compensatory and other appropriate damages;

b.      Punitive damages, equitable relief; and

c.      Such other relief as the Court deems appropriate.

## COUNT IV -- CIVIL CONSPIRACY TO COMMIT FRAUD

137.    Plaintiff incorporates paragraphs 1-104.  This claim is against all defendants.

138.    Defendants combined and conspired with each other and/or with Accurate to unlawfully arrange for and produce a fraudulent, appraised value for the property plaintiff sought to purchase.  They also agreed with each other to inflated plaintiff's income and other information on the loan application.

139.    Defendants took concerted and overt actions in furtherance of the conspiracy to commit fraud.  Defendants agreed upon a minimum value or range of value in advance of the appraisal being performed, and Wachovia approved the loan knowing that the probable, actual value of the home was well below $195,000.

140.    Defendants conspired - out of excessive concern for their fees, commissions, profits and returns - to misrepresent, conceal, overlook and suppress the actual market value of the property and plaintiff's actual income.

141.    Plaintiff was damaged as a result.

WHEREFORE, plaintiff requests that the Court enter judgment against defendants for:

a.    Actual, compensatory and other appropriate damages;

b.    Punitive damages, equitable relief; and

c.    Such other or further relief as this Court deems appropriate.

## COUNT V - ILLINOIS CONSUMER FRAUD ACT

142.    Plaintiff incorporates paragraphs 1-107.  This claim is against all defendants.

143.     Defendants engaged in unfair and deceptive practices, in violation of §2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2, by engaging in a combination of practices including but not limited to:  baiting-and-switching plaintiff on quoted loan terms that were affordable for him, misrepresenting the loan terms to plaintiff, falsifying plaintiff's material information on the loan application, fraudulently inflating the appraised value of the property, approving a loan based on such information, disguising the fact that plaintiff was receiving a loan he could not afford, withholding and concealing disclosure documents from plaintiff, secretly assigning plaintiff a higher interest rate than he qualified for and not explaining his choice of interest rate; discriminating against plaintiff on the basis of race; having plaintiff sign a loan application containing false information; and knowingly engaging in improvident lending with respect to plaintiff.

144.     Defendants engaged in such conduct in the course of trade and commerce.

145.     Defendants engaged in such conduct with the intent that plaintiff rely on their deception.

146.     Defendants engaged in such conduct with the intent to injure plaintiff.

147.     Plaintiff was damaged as a result.

148.     Defendants' conduct caused plaintiff's injuries.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:  compensatory, punitive and other appropriate damages; equitable relief; attorney's fees, litigation expenses and costs; and such other or further relief as the Court deems appropriate.

## <u>COUNT VI – NEGLIGENT MISREPRESENTATION</u>

149.    Plaintiff incorporates paragraphs 1 – 107.   This count is against all defendants.

150.    Defendants negligently misrepresented to plaintiff the monthly payment amount, the putative affordability of the property and the loan and other terms of the transactions.

151.    Defendants negligently failed to provide plaintiff with preliminary written disclosures and with written or accurate oral notification of any change in loan terms.

152.    Defendants were well-aware that plaintiff is an unsophisticated, first-time home owner, with little knowledge or education concerning real estate and mortgage financing. Defendants knew that plaintiff had limited income.   Yet defendants did not correctly or accurately represent or explain the terms of the purchase or the loan to plaintiff.

153.    Defendants made the misrepresentations detailed above in their business or professional capacities.  All of the misrepresentations were made in a commercial setting and directly to plaintiff.

154.    In making the misrepresentations, defendants breached their duty to plaintiff to accurately represent, describe and explain the terms of the loans, thereby taking precautions against creating an unreasonable risk of injury from foreseen and foreseeable events -- such as the prospect of plaintiff's inability to make payments, the event of mortgage default, the destruction of plaintiff's credit, the loss of the family's home in foreclosure, and other financial injuries to plaintiff.

155.    As a result of defendants' negligent misrepresentations, plaintiff suffered damages and continues to suffer damages.

156.    Defendants' negligent misrepresentations caused plaintiff's injuries.

Plaintiff justifiably relied on defendants' misrepresentations. Defendants knew or could contemplate or foresee that plaintiff would rely on their negligent misrepresentations.

157.    Defendants conduct was wanton and willful, reckless and malicious.

WHEREFORE, plaintiff prays for actual and compensatory damages, the reasonable cost of repair, punitive damages, equitable relief and any other or further relief that the Court deems just.

## COUNT VII – NEGLIGENCE

158.    Plaintiff incorporates paragraphs 1 – 107. This count is against all defendants.

159.    In the alternative, defendants were negligent in approving a loan to plaintiff that were based on falsified financial, employment and asset information.

160.    Defendants had a general duty of care toward plaintiff in arranging and brokering the purchase of his home and in arranging, brokering and originating mortgage financing for that purpose.

161.    Defendants had a duty to plaintiff to take precautions against creating unreasonable risk of injury from foreseen and foreseeable events, such as plaintiff's eventual inability to make payments, default on the mortgage, destruction of plaintiff's credit, and the loss of plaintiff's home in foreclosure.

162.    Wachovia's duty of care to plaintiff was non-delegable. It had a duty to ensure that its loan to plaintiff was based upon accurate financial information and accurate qualifying ratios. It had a duty not to engage in improvident lending.

163.    It was foreseeable that plaintiff, who defendants knew had limited income, would not be able to afford the payments on the home based on the false information and the loan terms he received.

164.    As professionals, defendants were also under a duty to use their professional judgment, skill and knowledge as practitioners in the real estate, mortgage brokerage and mortgage finance fields.

165.    Defendants breached their duties to plaintiff.

166.    As a result, plaintiff's property interests and financial security have been damaged. Specifically, Wacchovia has filed a foreclosure action against plaintiff, plaintiff is in danger of losing his home, any equity in the home is in danger of being lost, and plaintiff's credit and financial future has been severely damaged.

167.    Defendants' breach of their duties to plaintiff was the actual and proximate cause of plaintiff's injuries.

168.    Defendants' conduct was wanton and willful, reckless and malicious.

WHEREFORE, plaintiff prays for actual and compensatory damages, the reasonable cost of repair, punitive damages, equitable relief, and any other or further relief that the Court deems just.

## COUNT VIII – INTENTIONAL/NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

169.    Plaintiff incorporates paragraphs 1-107. This count is against all defendants.

170.    It was extreme and outrageous conduct on defendants' part to abuse their professional offices and the explicit trust that plaintiff placed in them by leading plaintiff, by

means of deception and concealment, to purchase a home and take out a loan that defendants knew plaintiff could not afford. Defendants knew from the start that plaintiff was unsophisticated, first-time home buyers. Defendants knew that the inevitable result of defendants' conduct would be foreclosure on plaintiff's home. Yet defendants took full advantage of plaintiff's vulnerability and exploited him.

171.    Defendants intended to cause plaintiff severe emotional distress or were reckless as to the effect of their conduct on plaintiff. They acted in reckless disregard of a high probability that emotional distress to plaintiff would result from their actions.

172.    Defendants knew that plaintiff had limited financial means and reserves, was financially vulnerable and, therefore, more susceptible to emotional distress than people who are financially better off and more able to absorb financial shock.

173.    Defendants' extreme and outrageous conduct caused plaintiff's severe emotional distress.

174.    Plaintiff has been damaged in that he has suffered and continues to suffer actual, severe emotional distress. Plaintiff lives in fear of losing his home, in fear of financial insecurity and in fear of the future.

175.    Defendants' conduct shocks the conscience and transcends all bounds of decency.

WHEREFORE, plaintiff prays for actual damages, punitive damages and any other or further relief that the Court deems just.

## COUNT IX - BREACH OF FIDUCIARY DUTY

176.    Plaintiff incorporates paragraphs 1-107. This claim is against all defendants.

25

177.    One who undertakes to find and arrange financing or broker the purchase of real estate for another becomes the latter's agent for that purpose and owes a fiduciary duty to act in the interest of the principal and make full disclosure of all material facts that might affect the principal's decision.

178.    Kash undertook to serve as plaintiff's real estate agent or broker.  Looby and Republic undertook to serve as plaintiff's mortgage broker.

179.    As set forth above, plaintiff entrusted matters to defendants to handle on his behalf and authorized them to act in his best interest and for his benefit.

180.    Defendants voluntarily accepted that charge and undertook to manage plaintiff's real estate and mortgage financing transactions.

181.    Explicitly or implicitly, defendants represented to plaintiff that they would find or arrange for plaintiff the best deals on a home and financing.

182.    In addition, on information and belief, Kash, Looby and Republic had written, agency agreements with plaintiff that granted to them the exclusive right to serve as plaintiff's agents for purposes of brokering the purchase of real estate and/or arranging mortgage financing.

183.    Pursuant to these agreements, defendants had the authority to act and did act to affect the legal rights of plaintiff.

184.    Defendants breached their respective fiduciary duties to plaintiff by, among other things: failing to disclose material information to plaintiff; making affirmative misrepresentations to plaintiff; overcharging plaintiff; increasing plaintiff's interest rate in exchange for a YSP from Wachovia; arranging for the purchase of real estate and for loans

plaintiff could not afford; and by otherwise engaging in conduct that was fraudulent or negligent and directly adverse to the interests of plaintiff.

185.    Defendants intentionally or negligently disregarded the interests of plaintiff and acted purely or primarily for their own financial benefit.

186.    Plaintiff was injured and damaged as a result.

187.    Defendants' conduct was deliberately oppressive, corrupt and dishonest. Substantial punitive damages are warranted.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:  compensatory, punitive and other appropriate damages; equitable relief; costs; and such other or further relief as the Court deems appropriate.

## COUNT X - INDUCMENT OF BREACH OF FIDUCIARY DUTY

188.    Plaintiff incorporates paragraphs 1-107.  This count is against defendant Wachovia.

189.    Wachovia induced a breach of Republic, Looby and/or Kash's fiduciary duties to plaintiff through its policy and practice of paying a YSP to a broker in exchange for the broker's cooperation in unnecessarily inflating plaintiff's interest rates.

190.    Wachovia intended for its authorized brokers, such as Republic, to raise the interest rates of its borrowers.

191.    Wachovia's promise of additional compensation for Republic and other defendants was material inducement for defendants to breach their fiduciary duty to plaintiffs.

192.    Defendants did breach their fiduciary duty to plaintiffs, as alleged above. Defendants breached their fiduciary duty in exchange for the payment of from Wachovia.

193.    Wachovia knew that this breach would be the direct or proximate result of its policy of paying YSPs and of paying the YSP to Republic.

194.    Plaintiff was damaged as a result.

195.    Wachovia's inducement of defendants to breach their fiduciary duties to plaintiff caused plaintiff's damages.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:  compensatory, punitive and other appropriate damages; equitable relief; costs; and such other or further relief as the Court deems appropriate.

## COUNT XI - CIVIL RIGHTS ACT

196.    Plaintiff incorporates ¶¶ 1-107.  This claim is against all defendants.

197.    Defendants intentionally discriminated against plaintiff on the basis of race in arranging and brokering the purchase of the property and in arranging, brokering and originating the loan for that purpose.

198.    Plaintiff was qualified to obtain financing to purchase a house, but he received terms and conditions less favorable than defendants' similarly qualified Caucasian borrowers, in violation of 42 U.S.C. § 1981.

199.    Plaintiff was steered by defendants, based on his race; once plaintiff submitted an application, he was singled out and exploited in the real estate and financing transactions because of his race.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiffs and against defendants for:  actual damages, punitive damages, equitable relief, attorney's fee and costs and any other or further relief that the Court deems just.

## COUNT XII FAIR HOUSING ACT

200.    Plaintiffs incorporate paragraphs 1-107.  This count is against Wachovia and Republic.

201.    As noted, defendants' payment and receipt of YSPs meant plaintiff received a higher interest rate than he otherwise would have.

202.    On information and belief, defendants, on average, give higher interest rates more often to minority borrowers than to Caucasians, regardless of qualifications, and defendants charge more in closing fees (as a percentage of loan principal) more often to minority borrowers than they do to their white customers.  Plaintiff was overcharged in this manner.

203.    Defendants' pricing practices disproportionately impact minority borrowers such as plaintiff.  Plaintiff and other minorities are, on average and more frequently, subject to higher interest rates and closing fees simply because of their race.

204.    This result is known and intended by defendants.

205.    This result is very lucrative for defendants.  Loans with higher interest rates, and with higher closing fees that are financed, earn Wachovia more in profits, whether it holds the loans in portfolio or sells them to investors on the secondary market.

206.    As noted, Wachovia's loan pricing policies delegate significant authority and discretion to individual mortgage brokers and loan officers to set interest rates and closing fees.  This system gives and is intended to give such loan officers and brokers incentives to engage in the subjective mark-up of credit applicants' interest rates and closing fees, without regard to borrower qualifications or borrower risk.  Wachovia permits its otherwise neutral underwriting criteria to be overridden in this manner.  One of the subjective criteria that enter into the loan officers' and mortgage brokers' equation is race.

207.    Wachovia is well aware that its pricing policies influence its loan officers' and mortgage brokers' sales behavior.  This is the policy's intended effect.

208.    On information and belief, Wachovia's brokers and loan officers are compensated in significant part on the basis of the interest rate and/or fees associated with the loans they originate or broker, which provides them with the incentive to increase minority borrowers' interest rates and closing costs, whenever possible.

209.    Wachovia's brokers are, on average, more effective in persuading its African-American and Latino credit applicants to accept higher interest rates and closing fees than its white customers.

210.    In recent years, interest rate and closing fee disparities by race have been the subjects of numerous credible studies and discussion, including in trade journals and other industry publications.  Defendants were on notice of the findings of these studies and related concerns but continued their lucrative practices anyway.

211.    There is no legitimate business reason justifying the discriminatory effect of plaintiff's and other minorities' assignment by defendants, regardless of qualifications, of higher interest rates and closing fees, on average, than defendants' white borrowers.

212.    Alternative policies and practices exist that would not have had the same disparate impact on plaintiff and other minority borrowers.

213.    As a result of defendants' conduct, plaintiff was induced to sign loan documents providing for a loan that was unnecessarily expensive and that was made on less favorable terms than loans defendants made to similarly-situated Caucasians.

214.    Defendants' conduct violates the Fair Housing Act, 42 U.S.C. Sect. 3605. Defendants assigned plaintiff and other minorities a higher interest rate, on average and more

frequently, than it did to their Caucasian customers.  Defendants charged higher broker fees, on

average and more frequently, to plaintiff and other minority customers.

215.    Plaintiff will prove his claims of discrimination, in part, through a

statistical analysis of defendants' loan transactions.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of

plaintiff and against defendants for:

a.    Declaratory relief;

b.    Injunctive relief;

c.    Actual damages;

d.    Attorney's fees, litigation expenses and costs; and

e.    Such other or further relief as the Court deems appropriate.

## COUNT XIII – EQUAL CREDIT OPPORTUNITY ACT

216.    Plaintiff incorporates paragraphs 1-107 and 215-215.  This claim is against

Wachovia and Advanced Lending.

217.    Defendants violated 15 U.S.C. Sect. 1691 of the ECOA in the manner

alleged above.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of

plaintiff and against defendants for:

a.    Declaratory relief;

b.    Injunctive relief;

c.    Appropriate damages;

d.    Attorney's fees, litigation expenses and costs; and

e.    Such other or further relief as the Court deems appropriate.

31

Respectfully submitted,


s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and The Social Justice Project,
208 S. LaSalle Street, Suite #1650
Chicago, Illinois  60604
Phone - (312) 345-1004
Fax - (312) 346-3242
al@alhofeldlaw.com

## JURY DEMAND

Plaintiff demands trial by jury.


s/Al Hofeld, Jr.
Al Hofeld, Jr.



## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such

amount as a court awards.


s/Al Hofeld, Jr.
Al Hofeld, Jr.


Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and The Project for Social Justice, Inc.
208 S. LaSalle Street, Suite #1650
Chicago, Illinois 60604
Phone - (312) 345-1004
Fax – (312) 346-3242
al@alhofeldlaw.com

08CV4571
JUDGE GOTTSCHALL
MAGISTRATE JUDGE VALDEZ
RCC

# EXHIBIT A

WELLS

# NOTE

June 11, 2007          CHICAGO                    IL
[Date]                              [City]                        [State]

9216 S AVALON AVE, CHICAGO, IL  60619

[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $    195,000.00     (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is
**WACHOVIA MORTGAGE CORPORATION**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled
to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate
of    **7.5000**        %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of
this Note.

### 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the  **first**     day of each month beginning on  **August 1, 2007**          . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before
Principal. If, on  **July 1, 2037**              , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."

I will make my monthly payments at **1100 Corporate Center Dr., Raleigh, NC 27607-5066**
or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ **1,363.47**

### 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment
as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to
the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the
Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the
Note Holder agrees in writing to those changes.

**MULTISTATE FIXED RATE NOTE**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

7869683-00

Wolters Kluwer Financial Services
VMP®-5N (0207).01
Page 1 of 3

**Form 3200 1/01**

Initials: 

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **05** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

7869683-00

VMP®-5N (0207).01                    Page 2 of 3                    Form 3200 1/01
Initials: 

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

X _Ronald Wells_____ (Seal)          _____ (Seal)
RONALD      WELLS                -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                        -Borrower

*[Sign Original Only]*

7869683-00

# EXHIBIT B

Return To:

**WACHOVIA MORTGAGE CORPORATION**
**1100 Corporate Center Dr (NC4723)**
**Raleigh, NC 27607**

Prepared By:

———————————— [Space Above This Line For Recording Data] ————————————

# MORTGAGE

MIN **100013700078696836**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated **June 11, 2007**
together with all Riders to this document.
(B) **"Borrower"** is **RONALD   WELLS, A SINGLE MAN**

Borrower is the mortgagor under this Security Instrument.
(C) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**7869683-00**

ILLINOIS - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT WITH MERS**    Form 3014 1/01

⊕ -6A(IL) (0010)
Page 1 of 15         Initials: 
    VMP MORTGAGE FORMS - (800)521-7291

(D) "Lender" is **WACHOVIA MORTGAGE CORPORATION**

Lender is a **A Corporation**
organized and existing under the laws of **NORTH CAROLINA**
Lender's address is
**1100 Corporate Center Dr., Raleigh, NC 27607-5066**
(E) "**Note**" means the promissory note signed by Borrower and dated **June 11, 2007**
The Note states that Borrower owes Lender
**One Hundred Ninety-Five Thousand and No/100**                    Dollars
(U.S. $      **195,000.00**        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than     **July 1, 2037**
(F) "**Property**" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "**Escrow Items**" means those items that are described in Section 3.
(M) "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.
(N) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the
Loan.
(O) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used in this
Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a
"federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan"
under RESPA.



Initials: **7869683-00**

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the **COUNTY**
[Type of Recording Jurisdiction] of **COOK**                                    [Name of Recording Jurisdiction]:

**SEE TITLE**

Parcel ID Number:                                         which currently has the address of
**9216 S AVALON AVE**                                                         [Street]
**CHICAGO**                                    [City], Illinois    **60619**      [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items



7869683-00

Initials:

-6A(IL) (0010)                    Page 3 of 15                        Form 3014  1/01

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of

7869683-00

Initials: 

Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

7869683-00

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the



Initials: _____　　7869683-00

excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage

Initials: _____    7869683-00

-6A(IL) (0010)    Page 8 of 15    Form 3014  1/01

Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or

7869683-00

Initials: [signature]

any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments form third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall

Initials: _____

7869683-00

not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

**25. Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

Initials

7869683-00

Form 3014  1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
RONALD    WELLS                                   -Borrower

_____

_____ (Seal)
                                                  -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                              -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                              -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                              -Borrower

7869683-00

-6A(IL) (0010)                Page 14 of 15                Form 3014  1/01

STATE OF ILLINOIS,　　　　　　　　　　　　　　　　　　　　　County ss:

I,　Mary Munder　　　　　　　　　, a Notary Public in and for said county and
state do hereby certify that

Ronald Wells

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument,
appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said
instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this　11　day of　June 2007　　　　　.

My Commission Expires: 5/1/10

Mary Munder
_____
Notary Public

7869683-00

-6A(IL) (0010)　　　　　　　　　　　Page 15 of 15　　　　Initials:　　　　　　Form 3014　1/01

**STREET ADDRESS:** 9216 S. AVALON
**CITY:** CHICAGO                    **COUNTY:** COOK
**TAX NUMBER:** 25-02-406-022-0000

**LEGAL DESCRIPTION:**

LOT 7 IN BELLEVUE, A SUBDIVISION OF THE WEST 1/2 OF THE SOUTHWEST 1/4 OF THE NORTHWEST
1/4 OT SOUTHWEST 1/4 OF SECTION 2, TOWNSHIP 37 NORTH, RANGE 14, EAST OF THE THIRD
PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

CLEGALD

# EXHIBIT C

| No. of Payments | Amount of Payments | When Payments Due |
|---|---|---|
| 120 | 1,521.10 | Monthly, beginning August 1, 2007 |
| 49 | 1,395.97 | Monthly, beginning August 1, 2017 |
| 190 | 1,363.47 | Monthly, beginning September 1, 2021 |
| 1 | 1,360.95 | Monthly, beginning July 1, 2037 |

( X ) If this is checked, Mortgage Insurance is included in the amount of the payments above.
(e) means estimate

**LOAN FEATURES**   ( ) This loan contains a variable rate feature.  Disclosures about the variable rate feature have been provided to you earlier.
( ) This loan has a demand feature.

**INSURANCE**   Property Insurance is required as a condition of this loan.
You may obtain property hazard insurance from anyone that is acceptable to us.

**SECURITY**   You are giving a security interest in: 9216 S AVALON AVE
CHICAGO, IL 60619

**FILING FEES**   Estimated charges for filing or recording the security instrument and related documents are
$        105.00

**LATE CHARGE**   If a payment is late, you will be charged        05        % of the payment

**PREPAYMENT**   If you pay off early, you
( ) may (X) will not have to pay a penalty.
( ) may (X) will not be entitled to a refund of part of the finance charge.

**ASSUMPTION**   Someone buying your home
(X) Cannot assume the remainder of the mortgage on the original terms.
( ) May, subject to conditions, assume the remainder of the mortgage on the original terms.

**CONTRACT DOCUMENTS**
See your Contract Documents for additional information about non-payment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

This Disclosure provided to borrower on   June 11, 2007

| | |
|---|---|
| BORROWER/OWNER                          DATE | BORROWER/OWNER                          DATE |
| **RONALD   WELLS** | |
| BORROWER/OWNER                          DATE | BORROWER/OWNER                          DATE |
| BORROWER/OWNER                          DATE | BORROWER/OWNER                          DATE |
| BORROWER/OWNER                          DATE | BORROWER/OWNER                          DATE |

240576 (rev02) (06/03)        6/11/07        **BORROWER COPY**        MC1073

# EXHIBIT D

| A. | | B. TYPE OF LOAN | |
|---|---|---|---|
| **CHICAGO TITLE INSURANCE COMPANY** **CHICAGO TITLE AND TRUST COMPANY** | | 1. ☐ FHA  2. ☐ FmHA  3. ☐ CONV UNINS. 4. ☐ VA  5. ☐ CONV. INS. | 6. ☐ CONDOMINS. |
| CLOSER: MARY MUNDELL | | 6. File Number: | HK6260953  MTW |
| DATE OF PRINTING: 06/11/07 | | | 027046324-001 MM3  LND |
| TIME OF PRINTING: 16:27 | | 7. Loan Number  7869683 | |
| SETTLEMENT STATEMENT U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT | | 8. Mortgage Insurance Case Number | |

| C. NOTE: | This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals. |
|---|---|

| D. NAME OF BORROWER: | RONALD WELLS | | |
|---|---|---|---|
| ADDRESS: | 7642 S. EXXEX AVE | | |
| | CHICAGO | ILLINOIS | 60646 |

| E. NAME OF SELLER: | ROMERE SOUTHALL | | |
|---|---|---|---|
| ADDRESS: | 9216 S. AVALON | | |
| | CHICAGO | ILLINOIS | 60619 |

| F. NAME OF LENDER: | WACHOVIA MORTGAGE CORPORATION | | |
|---|---|---|---|
| ADDRESS: | 1100 CORPORATE CENTER DRIVE | | |
| | RALEIGH | NORTH CAROLINA | 27607-\ |

| G. PROPERTY LOCATION: | 9216 S. AVALON | | |
|---|---|---|---|
| | CHICAGO | ILLINOIS | 60619 |

| H. SETTLEMENT AGENT: | CHICAGO TITLE AND TRUST COMPANY | | | I. SETTLEMENT DATE: |
|---|---|---|---|---|
| ADDRESS: | 171 NORTH CLARK | | | June 11, 2007 |
| | CHICAGO | ILLINOIS | 60601 | 01:30 |
| PLACE OF SETTLEMENT: | 171 NORTH CLARK | | | DISBURSEMENT DATE: |
| ADDRESS: | 171 NORTH CLARK | | | June 11, 2007 |
| | CHICAGO | ILLINOIS | 60601 | |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract sales price | 195,000.00 | 401. Contract sales price | 195,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 2,181.50 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes      to | | 406. City/town taxes      to | |
| 107. County taxes      to | | 407. County taxes      to | |
| 108. Assessments      to | | 408. Assessments      to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. GROSS AMT DUE FROM BORROWER | 197,181.50 | 420. GROSS AMT DUE TO SELLER | 195,000.00 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 195,000.00 | 502. Settlement charges to seller      (line 1400) | 7,464.62 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| | | 504. Payoff of first mortgage loan | |
| 204. | | GREENPOINT MORTGAGE | 10,782.54 |
| 205. | | 505. Payoff of second mortgage loan | |
| | | GREENPOINT MORTGAGE | 83,883.92 |
| 206. | | 506. INVESTOR/REHAB PYMT TO TONY THOMAS | 20,000.00 |
| 207. | | 507. 06 1ST INST TO COOK COUNTY COLLECTOR | 552.16 |
| 208. | | 508. DUPL BILL TO COOK COUNTY COLLECTOR | 5.00 |
| 209. | | 509. Add'l Settle Chgs to Seller (attached) | 615.85 |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes      to | | 510. City/town taxes      to | |
| 211. County taxes  07/01/06  to  12/31/06 | 902.32 | 511. County taxes  07/01/06  to  12/31/06 | 902.32 |
| 212. Assessments      to | | 512. Assessments      to | |
| 213. 07 TAXES 01/01/07 THRU 06/11/07 | 779.18 | 513. 07 TAXES 01/01/07 THRU 06/11/07 | 779.18 |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. TOTAL PAID BY/FOR BORROWER | 196,681.50 | 520. TOTAL REDUCTIONS AMT DUE SELLER | 124,985.59 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER** | | **600. CASH AT SETTLEMENT TO/FROM SELLER** | |
| 301. Gross amt due from borrower    (line 120) | 197,181.50 | 601. Gross amt due to seller      (line 420) | 195,000.00 |
| 302. Less amts paid by/for borrower (line 220) | (196,681.50) | 602. Less reductions in amt due seller (line 520) | (124,985.59) |
| 303. CASH (☒ FROM) (☐ TO) BORROWER | 500.00 | 603. CASH (☒ TO) (☐ FROM) SELLER | 70,014.41 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower _Ronald Wells_                    Seller _Romere Southall_
RONALD WELLS                                           ROMERE SOUTHALL

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.    _June 11 2007_

Settlement Agent                                                    Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

MM3                                                    HUD-1 (3/86) RESPA, HB 4305.2

ORD#/ABS# HK6260951 MTW

TIME OF PRINTING: 16:27

**SETTLEMENT CHARGES**

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| 700. | TOTAL SALES/BROKER'S COMMISSION based on price $ 195,000.00 @ % | | |
| | Division of Commission (line 700) as follows: | | |
| 701. | LB: $ to | | |
| 702. | SB: $ to | | |
| 703. | Commission paid at Settlement (Money retained by broker applied to commission $ ) | | |
| 704. | Other sales agent charges: | | |
| 705. | Additional commission: $ to | | |
| **800.** | **ITEMS PAYABLE IN CONNECTION WITH LOAN** | | |
| 801. | Loan Origination Fee % | | |
| 802. | Loan Discount % | | |
| 803. | Appraisal Fee to ACCURATE | | 300.00 |
| 804. | Credit Report to KROLL | | 15.80 |
| 805. | Lender's Inspection Fee to | | |
| 806. | Mortgage Insurance Application Fee to | | |
| 807. | Assumption Fee to | | |
| 808. | TAX SERVICE TO FIRST AMERICAN REAL ESTATE TAX SERVICE | | 78.00 |
| 809. | PROCESSING FEE TO REPUBLIC MORTGAGE | | 350.00 |
| 810. | ADMINISTRATIVE TO WACHOVIA MORTGAGE CORPORATION | | 630.00 |
| 811. | BROKER COMP TO REPUBLIC MORTGAGE $6078.15 POC BY WACHOVIA MO | | |
| 812. | ADDITIONAL ITEMS PAYABLE IN CONNECTION WITH LOAN (ATTACHED) | | 33.00 |
| **900.** | **ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. | Interest from 06/13/07 to 07/01/07 @$ /day for 20 days | | 801.40 |
| 902. | Mortgage Insurance Premium for 0.00 months to | | |
| 903. | Hazard Insurance Premium for 1.00 years to STATE FARM INSURANCE | | 947.00 |
| 904. | | | |
| 905. | | | |
| **1000.** | **RESERVES DEPOSITED WITH LENDER** | | |
| 1001. | Hazard Insurance 4.00 month @$ per month | | 315.68 |
| 1002. | Mortgage insurance 0.00 month @$ per month | | |
| 1003. | City property taxes 0.00 month @$ per month | | |
| 1004. | County property taxes 6.00 month @$ per month | | 520.92 |
| 1005. | Annual assessments 0.00 month @$ per month | | |
| 1006. | 0.00 month @$ per month | | |
| 1007. | 0.00 month @$ per month | | |
| 1008. | Aggregate Accounting Adjustment | 0.00 | ( 173.68) |
| **1100.** | **TITLE CHARGES** | | |
| 1101. | Settlement or Closing Fee to CHICAGO TITLE AND TRUST COMPANY | | 550.00 |
| 1102. | Abstract or title search to | | |
| 1103. | Title examination to | | |
| 1104. | Title insurance binder to | | |
| 1105. | Document preparation to | | |
| 1106. | Notary fees to | | |
| 1107. | Attorney's fee to ANTHONEY N. PANZICA | | 750.00 |
| 1108. | Title Insurance to CHICAGO TITLE/ ANTHONEY N. PANZICA | | 1,575.00 |
| | (includes above items numbers:) COMP, EPA , LOC | | |
| 1109. | Lender's coverage $195,000.00 $ 550.00 | | |
| 1110. | Owner's coverage $195,000.00 $ 1,025.00 | | |
| 1111. | COMMITMENT/ POLICY FEE TO CHICAGO TITLE | | 150.00 |
| 1112. | EXPRESS DELIVERY SERVICE TO CHICAGO TITLE | | 75.00 |
| 1113. | EMAIL PACKAGE FEE TO CHICAGO TITLE | | 25.00 |
| **1200.** | **GOVERNMENT RECORDING AND TRANSFER CHARGES** | | |
| 1201. | Recording fees: Deed $ 38.00 ; Mortgage $ 128.00 ; Release $ | 166.00 | 36.00 |
| 1202. | City/county tax/stamps: Deed $ 1,560.00 ; Mortgage $ | 1,462.50 | 97.50 |
| 1203. | State tax/stamps: Deed $ 195.00 ; Mortgage $ | | 195.00 |
| 1204. | STATE OF ILLINOIS REGISTRATION FEE TO CHICAGO TITLE INSURANC | 3.00 | 3.00 |
| 1205. | | | |
| **1300.** | **ADDITIONAL SETTLEMENT CHARGES** | | |
| 1301. | Survey to | | |
| 1302. | Past Inspection to | | |
| 1303. | BUYER ATTORNEY FEE TO GLEN CHARTOW | 300.00 | |
| 1304. | 24 MONTH CHAIN OF TITLE TO CHICAGO TITLE INSURANCE COMPANY | 250.00 | |
| 1305. | TAX PAYMENT FEE TO CHICAGO TITLE INSURANCE COMPANY | | 40.00 |
| 1306. | CONSTRUCTION ESCROW FEE TO CHICAGO TITLE | | 150.00 |
| 1307. | | | |
| **1400.** | **TOTAL SETTLEMENT CHARGES** (enter on lines 103, Section J and 502, Section K) | 2,181.50 | 7,464.62 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower RONALD WELLS

Seller ROMERE SOUTHALL

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause funds to be disbursed in accordance with this statement.

Settlement Agent

Date

WARNING: It is a crime to knowingly make false statement to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

HUD-1 (3/86) RESPA, HB 4305.2

NM3

---

ADDITIONAL BUYER SETTLEMENT CHARGES

                                                   CHARGE AMOUNT

---

ADDITIONAL SELLER SETTLEMENT CHARGES

                                                   CHARGE AMOUNT

| | | | |
|---|---|---|---|
| 509.001 | WATER CERT FEE TO ANTHONY N PANZICA | $ | 125.00 |
| 509.002 | ZONING CERT FEE TO ANTHONY N PANZICA | | 190.00 |
| 509.003 | REIMBURSEMENT FOR WATER BILL TO ANTHONY | | 300.85 |

TOTAL Additional Settlement Charges to Seller  (LINE 509)  $    615.85
                                                            ===============

| | | | |
|---|---|---|---|
| 812.001 | BROKER COURIER FEE TO REPUBLIC MORTGAGE | $ | 25.00 |
| 812.002 | FLOOD CERTIFI FEE TO FIRST AMERICAN DATA | | 8.00 |

TOTAL ADDITIONAL ITEMS PAYABLE IN CONNECTION WITH LOAN  (LINE 812)  $    33.00
                                                            ===============

---

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_Ronald Wells_                                    _Romere Southall_

**RONALD WELLS**                                **ROMERE SOUTHALL**

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds  which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

                                                  _June 11 2007_

**Settlement Agent**                                                              **Date**

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see:
    Title 18 U.S. Code Section 1001 and Section 1010.

```
ESCROW NUM:   027046324-001    ORDER NUM: 01401-HK6260953 NA
CLOSER:              MARY MUNDELL

BUYER:       RONALD WELLS

SELLER:      ROMERE SOUTHALL

PROPERTY:    9216 S. AVALON, CHICAGO, ILLINOIS 60619
```

```
             RECEIPTS
             --------
             RONALD WELLS                                       500.00
             WACHOVIA MORTGAGE CORPORAT                      198,897.83
                                                            --------------
                 TOTAL RECEIPTS                              199,397.83
                                                            ==============

             DISBURSEMENTS
             -------------
  A    CHICAGO TITLE AND TRUST COMPANY
             SETTLEMENT OR CLOSING FEE               550.00
             TITLE INSURANCE                         647.50
             COMMITMENT/ POLICY FEE                  150.00
             EXPRESS DELIVERY SERVICE                 75.00
             EMAIL PACKAGE FEE                        25.00
             RECORDING FEES                          202.00
             CITY/COUNTY TAX/STAMPS                1,560.00
             STATE TAX/STAMPS                        195.00
             STATE OF ILLINOIS REGISTRATION            6.00
             24 MONTH CHAIN OF TITLE                 250.00
             TAX PAYMENT FEE                          40.00
             CONSTRUCTION ESCROW FEE                 150.00
                 CHECK TOTAL                                   3,850.50

  B    ANTHONEY N. PANZICA
             ATTORNEY'S FEES                         750.00
                 CHECK TOTAL                                     750.00

  C    STATE FARM INSURANCE
             HAZARD INSURANCE PREMIUM                947.00
                 CHECK TOTAL                                     947.00

  D    REPUBLIC MORTGAGE
             APPRAISAL FEE                           300.00
             CREDIT REPORT                            15.80
             PROCESSING FEE                          350.00
             BROKER COURIER FEE                       25.00
             BROKER PREMIUM                        6,078.15
                 CHECK TOTAL                                   6,768.95

  E    ANTHONY N PANZICA
             TITLE INSURANCE                         927.50
                 CHECK TOTAL                                     927.50

  F    GLEN CHARTOW
             BUYER ATTORNEY FEE                      300.00
                 CHECK TOTAL                                     300.00

  G    TONY THOMAS
             INVESTOR/REHAB PYMT                  10,000.00
                 CHECK TOTAL                                  10,000.00

  H    UNIQUE INVESTMENT
             REHAB FEE                            10,000.00
                 CHECK TOTAL                                  10,000.00

  I    ANTHONY N PANZICA
             WATER CERT FEE                          125.00
             ZONING CERT FEE                         190.00
             REIMBURSEMENT FOR WATER BILL            300.85
                 CHECK TOTAL                                     615.85

  J    GREENPOINT MORTGAGE
             PAYOFF FIRST MORTGAGE               10,782.54
                 CHECK TOTAL                                  10,782.54

  K    GREENPOINT MORTGAGE
             PAYOFF SECOND MORTGAGE              83,883.92
                 CHECK TOTAL                                  83,883.92

  L    COOK COUNTY COLLECTOR
             06 1ST INST                            552.16
                 CHECK TOTAL                                     552.16
```

```
06/11/07    16:27    MM3
```

ESCROW NUM:   027046324-001    ORDER NUM: 01401-HK6260953 NA
CLOSER:            MARY MUNDELL

```
     M   COOK COUNTY COLLECTOR
              DUPL BILL                         5.00
              CHECK TOTAL                                      5.00

     N   ROMERE SOUTHALL
              NET PROCEEDS TO SELLER        70,014.41
              CHECK TOTAL                                 70,014.41
                                                        ----------------
          TOTAL DISBURSEMENTS                           199,397.83
                                                        ================

          BALANCE                                             0.00
                                                        ================
```

The undersigned authorize Chicago Title and Trust Company, as Agent for WACHOVIA MORTGAGE CORPORATION
to make the expenditures and disbursements as listed above and we hereby approve the same, jointly and severally, for payment. The undersigned mortgagors certify
that the signatures on the note and mortgage, if any, furnished as security for the loan are genuine and that the consideration therefor was actual and valid without
offset or defense.

_____    _____    _____
         Date                      Borrower                     Seller

Chicago Title & Trust Co.    _____    _____


_____    _____    _____
    Authorization

    06/11/07     16:27    MM3

# EXHIBIT E

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower", as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

_____ _____
Borrower                  Co-Borrower

FINAL

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA  ☑ Conventional  ☐ Other (explain): | Agency Case Number | Lender Case Number |
|---|---|---|---|
| | ☐ FHA  ☐ USDA/Rural Housing Service | | Unassigned |

| Amount | Interest Rate | No. of Months | Amortization Type: |
|---|---|---|---|
| $ 195,000 | 7.500 % | 360/360 | ☑ Fixed Rate  ☐ Other (explain): |
| | | | ☐ GPM  ☐ ARM (type): |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, & ZIP) | No. of Units |
|---|---|
| 9216 S AVALON AVE, Chicago, IL 60819   County: Cook | 1 |

| Legal Description of Subject Property (attach description if necessary) | Year Built |
|---|---|
| SEE TITLE | 1910 |

| Purpose of Loan | ☑ Purchase  ☐ Construction  ☐ Other (explain): | Property will be: |
|---|---|---|
| | ☐ Refinance  ☐ Construction-Permanent | ☑ Primary Residence  ☐ Secondary Residence  ☐ Investment |

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a+b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements | ☐ made  ☐ to be made |
|---|---|---|---|---|---|
| | $ | $ | | Cost: $ | |

| Title will be held in what Name(s) | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| Ronalde Wells | Unmarried man | ☑ Fee Simple |
| | | ☐ Leasehold (show expiration date) |

| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) |
|---|
| Checking/Savings |

## III. BORROWER INFORMATION

|  | Borrower | Co-Borrower |
|---|---|---|
| Borrower's Name (include Jr. or Sr. if applicable) | RONALD Wells | Co-Borrower's Name (include Jr. or Sr. if applicable) |

| Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School | Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School |
|---|---|---|---|---|---|---|---|
| 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 | 773-341-8398 | 11/18/1949 | 18 | | | | |

| ☐ Married  ☑ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Co-Borrower) no. 0  ages | ☐ Married  ☐ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Borrower) no.  ages |
|---|---|---|---|

| Present Address (street, city, state, ZIP) | ☐ Own  ☑ Rent  8  No. Yrs. | Present Address (street, city, state, ZIP) | ☐ Own  ☐ Rent  No. Yrs. |
|---|---|---|---|
| 7842 S Essex Ave | | | |
| Chicago, IL 60649 | | | |

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP) | ☐ Own  ☐ Rent  No. Yrs. | Former Address (street, city, state, ZIP) | ☐ Own  ☐ Rent  No. Yrs. |
|---|---|---|---|

| Former Address (street, city, state, ZIP) | ☐ Own  ☐ Rent  No. Yrs. | Former Address (street, city, state, ZIP) | ☐ Own  ☐ Rent  No. Yrs. |
|---|---|---|---|

Fannie Mae Form 1003  07/05
CALYX Form Loanappt.frm 08/05

Page 1 of 5

Borrower _____
Co-Borrower _____

Freddie Mac Form 65  07/05

T-481  P.011/014  F-970    May 14 2007  13:58    REPUBLIC MORTGAGE INC. Fax: 773-774-0600    From-    10:14am  06-11-07

## IV. EMPLOYMENT INFORMATION

| Borrower | | | Co-Borrower | |
|---|---|---|---|---|
| Name & Address of Employer  ☐ Self Employ... | | Yrs. on this job  23 yr(s) 0 mth(s) | Name & Address of Employer  ☐ Self Employed | Yrs. on this job |
| SUPREME ELECTRONICS  3824 N SOUTHPORT SUITE 198  Chicago, IL 60657 | | Yrs. employed in this line of work/profession  23 | | Yrs. employed in this line of work/profession |
| Position/Title/Type of Business  FOREMAN | Business Phone (incl. area code)  312-409-5589 | | Position/Title/Type of Business | Business Phone (incl. area code) |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer  ☐ Self Employed | Dates (from-to) | Name & Address of Employer  ☐ Self Employed | Dates (from-to) |
|---|---|---|---|
| | Monthly Income  $ | | Monthly Income  $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

| Name & Address of Employer  ☐ Self Employed | Dates (from-to) | Name & Address of Employer  ☐ Self Employed | Dates (from-to) |
|---|---|---|---|
| | Monthly Income  $ | | Monthly Income  $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

| Name & Address of Employer  ☐ Self Employed | Dates (from-to) | Name & Address of Employer  ☐ Self Employed | Dates (from-to) |
|---|---|---|---|
| | Monthly Income  $ | | Monthly Income  $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

| Name & Address of Employer  ☐ Self Employed | Dates (from-to) | Name & Address of Employer  ☐ Self Employed | Dates (from-to) |
|---|---|---|---|
| | Monthly Income  $ | | Monthly Income  $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 9,243.80 | $ | $ 9,243.80 | Rent | $ 1,850.00 | |
| Overtime | | | | First Mortgage (P&I) | | $ 1,383.47 |
| Bonuses | | | | Other Financing (P&I) | | |
| Commissions | | | | Hazard Insurance | | 65.00 |
| Dividends/Interest | | | | Real Estate Taxes | | 180.30 |
| Net Rental Income | | | | Mortgage Insurance | | 165.00 |
| Other (before completing, see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ 9,243.80 | $ | $ 9,243.80 | Total | $ 1,850.00 | $ 1,794.77 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

Describe Other Income    **Notice:** Alimony, child support, or separate maintenance income need not be revealed if the borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |

Fannie Mae Form 1003   07/05
CALYX Form Loanapp2.frm 09/05

Page 2 of 5

Borrower _____
Co-Borrower _Ratel_

Freddie Mac Form 65   07/05

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this statement and supporting schedules must be completed by that spouse or other person also.

Completed ☐ Jointly ☑ Not Jointly

| ASSETS | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Description | | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
| Cash deposit toward purchase held by: | $ | Name and address of Company | $ Payment/Months | $ |
| | | WELLS FARGO | | |
| **List checking and savings accounts below** | | P.O. BOX 29704 | | |
| Name and address of Bank, S&L, or Credit Union | | PHOENIX, AZ 85038-9704 | | |
| LASALLE BANK | | | | |
| | | | 293 | 13,250 |
| | | Acct. no. 5023740446X220051 | | |
| Acct. no. 530439734 | $ 35,724 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | CHASE | | |
| | | 800 BROOKSEDGE BLVD | | |
| | | WESTERVILLE, OH 43081 | | |
| | | | 10 | 109 |
| | | Acct. no. 4286941166412016 | | |
| Acct. no. | | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | CHASE | | |
| | | 800 BROOKSEDGE BLVD | | |
| | | WESTERVILLE, OH 43081 | | |
| | | | 10 | 108 |
| Acct. no. | $ | Acct. no. 5401653033703077 | | |
| Stocks & Bonds (Company name/number description) | $ | Name and address of Company | $ Payment/Months | $ |
| | | | | |
| | | Acct. no. | | |
| Life insurance net cash value | $ | Name and address of Company | $ Payment/Months | $ |
| Face amount: $ | | | | |
| Subtotal Liquid Assets | $ 35,724 | Acct. no. | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ | Name and address of Company | $ Payment/Months | $ |
| Vested interest in retirement fund | $ | | | |
| Net worth of business(es) owned (attach financial statement) | $ | Acct. no. | | |
| Automobiles owned (make and year) | $ | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| | | | | |
| Other Assets (itemize) PERSONAL PROPERTY | $ 35,500 | Job-Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | $ 313 | |
| Total Assets a. | $ 71,224 | Net Worth (a minus b) ► $ 57,747 | Total Liabilities b. | $ 13,477 |

| Schedule of Real Estate Owned (if additional properties are owned, use continuation sheet) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
| | | $ | $ | $ | $ | $ | $ |
| | | | | | | | |
| | | | | | | | |
| Totals | | $ | $ | $ | $ | $ | $ |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number:

| Alternate Name | Creditor Name | Account Number |
|---|---|---|

Borrower
Co-Borrower

| VII. DETAILS OF TRANSACTION | | VIII. DECLARATIONS | | | | |
|---|---|---|---|---|---|---|
| | | | Borrower | | Co-Borrower | |
| | | If you answer "Yes" to any questions a through i, please use continuation sheet for explanation. | Yes | No | Yes | No |
| a. Purchase price | $ .00 | a. Are there any outstanding judgments against you? | ☐ | ☑ | ☐ ☐ |
| b. Alterations, improvements, repairs | | b. Have you been declared bankrupt within the past 7 years? | ☐ | ☑ | ☐ ☐ |
| c. Land (if acquired separately) | | c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | ☐ | ☑ | ☐ ☐ |
| d. Refinance (incl. debts to be paid off) | | d. Are you a party to a lawsuit? | ☐ | ☑ | ☐ ☐ |
| e. Estimated prepaid items | 2,385.06 | e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? | ☐ | ☑ | ☐ ☐ |
| f. Estimated closing costs | 4,077.59 | (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | | |
| g. PMI, MIP, Funding Fee | | | | | |
| h. Discount (if Borrower will pay) | | f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? | ☐ | ☑ | ☐ ☐ |
| i. Total costs (add items a through h) | 201,462.65 | If "Yes," give details as described in the preceding question. | | | |
| j. Subordinate financing | | g. Are you obligated to pay alimony, child support, or separate maintenance? | ☐ | ☑ | ☐ ☐ |
| k. Borrower's closing costs paid by Seller | 5,850.00 | h. Is any part of the down payment borrowed? | ☐ | ☑ | ☐ ☐ |
| l. Other Credits (explain) | | i. Are you a co-maker or endorser on a note? | ☐ | ☑ | ☐ ☐ |
| | | j. Are you a U.S. citizen? | ☑ | ☐ | ☐ ☐ |
| | | k. Are you a permanent resident alien? | ☐ | ☑ | ☐ ☐ |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 195,000.00 | l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | ☑ | ☐ | ☐ ☐ |
| n. PMI, MIP, Funding Fee financed | | m. Have you had an ownership interest in a property in the last three years? | ☐ | ☑ | ☐ ☐ |
| o. Loan amount (add m & n) | 195,000.00 | (1) What type of property did you own—principal residence (PR), second home (SH), or investment property (IP)? | | | |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | 612.65 | (2) How did you hold title to the home—solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | | | |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

**Acknowledgement.** Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | ☐ I do not wish to furnish this information | | CO-BORROWER | ☐ I do not wish to furnish this information | |
|---|---|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino | ☑ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino | ☐ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native  ☐ Asian  ☐ Black or African American | | Race: | ☐ American Indian or Alaska Native  ☐ Asian  ☐ Black or African American | |
| | ☐ Native Hawaiian or Other Pacific Islander  ☑ White | | | ☐ Native Hawaiian or Other Pacific Islander  ☐ White | |
| Sex: | ☐ Female  ☑ Male | | Sex: | ☐ Female  ☐ Male | |

| To be Completed by Interviewer This application was taken by: | Interviewer's Name (print or type) MICHAEL L. COOPY | | Name and Address of Interviewer's Employer REPUBLIC MORTGAGE INC |
|---|---|---|---|
| ☐ Face-to-face interview | Interviewer's Signature | Date | 2127 W BELMONT AVE |
| ☐ Mail | | | Chicago, IL 60618 |
| ☐ Telephone | Interviewer's Phone Number (incl. area code) | | (P) 773-774-1800 |
| ☑ Internet | 773-774-1800 | | (F) 773-774-0600 |

Fannie Mae Form 1003   07/05
CALYX Form Loanapp4.frm 05/05

Freddie Mac Form 65   07/05

May 14 2007  13:59    P.05

REPUBLIC MORTGAGE INC.  Fax:773-774-0600

T-481  P.014/014  F-870

06-11-07  10:16am    From-